HARRY BIJUR, complainant,

*v.*

BIJUR MOTOR APPLIANCE COMPANY, defendant.

[Submitted April 16th, 1923. Decided April 24th, 1923.]

**Insolvency and Receivers—Insolvency of Foreign Corporations —Sale of Entire Assets under Law of State of Incorporation —Appointment of Receiver or Liquidation by Directors of Corporation Admittedly Insolvent—Sale of Assets under Section 64 of Corporation Act.**

On bill, &c.

*Messrs. Hershenstein & Finnerty,* by *Mr. Charles Hershenstein,* and *Mr. Harry Bijur* (of the New York bar), on behalf of the complainant.

*Mr. J. Harry Hull,* on behalf of the creditor Lionello Perera.

*Messrs. Wall, Haight, Carey & Hartpence,* by *Mr. Thomas G. Haight,* and *Mr. Joseph M. Hartfield* (of *White & Case,* of the New York bar), on behalf of the defendants.

BENTLEY, V. C.

This bill is for a receiver and is filed against the Bijur Motor Appliance Company, a corporation of the State of Delaware, authorized to do business in this state. It is filed by the complainant on behalf of himself and all other stockholders and creditors of the company who wish to come in and contribute to the expense of this suit. An independent bill was filed simultaneously by Lionello Perera, and by agreement of all the parties he is to be considered as a co-complainant.

The defendant is the successor of the Bijur Motor Lighting

Company which, finding itself in financial difficulties during the war, was placed in the hands of receivers. Out of that litigation there came a reorganization and the formation of the present company. The reorganization was financed by the General Electric Company, which thereupon became and has ever since been the principal stockholder and creditor.

The General Electric Company now owns nine thousand seven hundred and fifty shares of the common stock of the defendant company out of a total issue of ten thousand shares, five thousand shares of the first preferred stock of the defendant which is the entire issue of that class, and two thousand six hundred and sixty-seven shares of second preferred stock out of three thousand one hundred and twenty-five issued. In addition, it has advanced and loaned, upon demand notes, $1,300,000, which is now due and owing from the defendant and, furthermore, has purchased $1,050,800 of notes issued by the defendant to other creditors, so that it has acquired all of the debts of the Bijur Motor Appliance Company except $7,900, excluding ordinary current expenses.

The complainant, Harry Bijur, owns one hundred and eighty-nine and one-half shares of second preferred stock and $1,500 of corporate notes; and the complainant Perera is the holder of eighty-seven and one-half shares of the second preferred stock; so that in the complainants there is not represented any of the common stock or the first preferred stock.

The bill charges, that until faced with the conditions consequent upon the world war the defendant's predecessor was operated under a capitalization of $312,500, at profits ranging from $150,000 to $300,000 a year, and that since the control thereof has come into the hands of the General Electric Company the business has been operated at a constantly-increasing loss, until to-day the company is insolvent. That the defendant and its predecessors were organized and conducted for the purpose of manufacturing the necessary machinery for the starting and lighting of automobiles, and that before the reorganization mentioned above the defendant's predecessor, or the inventor, before conveying his rights in his

patents, licensed the Eclipse Machine Company, for a very small consideration, to manufacture under the inventor's patents, which license has been the subject of litigation which has eventually terminated in upholding the validity of the same. Therefrom, the complainants charge, has arisen a situation whereby between them the defendant and the Eclipse Machine Company enjoy the control of the manufacture of such devices throughout the world.

On March 23d, 1923, upon notice as prescribed by section 64a of the Corporation act of the State of Delaware, a stockholders' meeting was held in Hoboken, at the plant of the defendant, where authority was voted by the stockholders to the directors to make sale of all the property of the defendant for a sum not less than $240,000, after it was explained to the stockholders that the defendant's competitor, the Eclipse Machine Company, had agreed to purchase the plant to be sold for the sum of $240,000. It should be said, in passing, that such sale was not to include cash in bank, claims for excess taxes paid, and certain other choses in action, but was, however, to include all patents and patent rights of the defendant.

The insolvency of the corporation is not only abundantly shown but is conceded. So that it becomes a question whether, in its discretion, the court should continue the receiver or discharge him. The argument proceeded upon this theory and the dispute between the parties was whether the directors could and would dispose of the defendant's assets to the best advantage of all the stockholders and creditors or whether a receiver would discharge that function to better advantage notwithstanding the increased burden of expense. Since the argument, however, there has been presented a further question as to whether or not the directors, under any circumstances, can make a sale of all or any of the assets of the company, in contemplation of the sixty-fourth section of our Corporation act.

The affidavits presented upon behalf of the defendant do not materially challenge the allegations of the bill except

to deny that the consummation of the contract with the Eclipse Machine Company will establish a monopoly of the starting and lighting industry in that corporation, with which denial I am inclined to agree,' because of the fact that it is conceded that at least three of the leading American makes of automobiles do not use a system manufactured under the Bijur patents, namely, the Dodge, the Buick, and the Cadillac.

The principal argument of the complainants is that the patents protecting the inventions made by Mr. Bijur are of enormous value, whereas they are listed in the defendants statement as having but a nominal value of $8,921.38. The defendant has shown conclusively, so far as subsequent improvement patents are concerned, they are now in litigation and the decisions to date strongly indicate that they are of no value whatsoever.

But the complainants say, even so, the original basis patent is the one under which the Eclipse Machine Company's license was made and that the Eclipse Machine Company is making annually a profit of upwards of a million dollars in its manufacture of starting and lighting devices. It appears that such devices made by the Eclipse Machine Company are the well-known Bendix Drive, of which only a part is manufactured under the Bijur license. The Eclipse Machine Company manufactures an individual part of such device which it sells in tremendous quantities to other manufacturers, and it is impracticable for the defendant to compete in such a trade. The defendant has been manufacturing not a part but a complete starting and lighting · system which apparently is used only in the very expensive grade of automobiles such as the Winton and the Rolls-Royce. In short, it appears that the difficulty with the defendant's business has been that it is making a high-grade appliance for which there is not a sufficient market to turn them out in production quantities so as to be commercially a success.

There has been no direct evidence upon· the part of the complainants as to the market value of the Bijur patent and, of course, this burden is upon them. The allegation is made with great earnestness that such patent or patents are of very

great value. But they are assertions only. It does not appear that either Mr. Bijur or Mr. Perera are experts in this matter and, on the other hand, the affidavits of trained lawyers, specializing in patent law, justify the value placed upon such patents by the defendant. The defendant's affidavits also show, and I think with all necessary and proper detail, that its officers and directors had tried diligently for the last two years to effect a sale of its assets, naming at least six of the concerns engaged in a like business, with whom the matter has been discussed. These affidavits further show that, I think in all but one instance, after an examination of the plant, no offer was made and, in the remaining instance, a tentative offer of $200,000 was made, which was subsequently withdrawn.

Similarly, I am not impressed with the argument that the directors should be removed, because of the fact that under their management the affairs of the defendant have gone from bad to worse. For the reasons I have expressed above, I think that the business was a hopeless one from the start because of the character and grade of the device manufactured in competition with a similar device manufactured under a better commercial scheme. There has been no charge of fraud or dishonesty made by the complainants against the directors of the company. It is true that through the entire argument by the complainants' counsel there has run an undercurrent of insinuation, but nothing that the defendant could meet. Of course, it is unnecessary for me to spend any time upon such insinuations. Perhaps it may be within the realm of possibility that there is a corrupt agreement between the General Electric Company and the Eclipse Machine Company, but there is not one scintilla of proof to that effect. It is impossible for me to decide this case upon what may be. I am obliged to arrive at my determination upon the facts that have been proved.

Some point has also been made of the continued expenditures by the General Electric Company in purchasing the debenture notes referred to above, after the defendant appeared to be hopelessly involvd in ruin. This seems to me

to be rather corroborative of the specific denial that there is any relationship existing between the General Electric Company and the Eclipse Machine Company, as set out in next to the last paragraph of the affidavit of Charles E. Patterson; because, if there had been a corrupt scheme existing between these two corporations to wreck and thus gain control of the defendant company it would not have been necessary for the General Electric Company to squander such a vast treasure. Two million dollars of its money would have done quite as well as three millions.

The complainants also make a determined attack upon the terms of sale of the assets of the defendant, arguing that such terms show that the assets are not being sold for the best interests of the creditors. The principal objection is that paragraph 2 provides that the sale shall be subject to the completion of unfilled contracts and the carrying out of the guarantees of the Bijur Motor Appliance Company in supplying parts and maintaining service stations under the valid contracts of the defendant. It seems to me that this court cannot quarrel with the attempt to honestly abide by contracts made with it in good faith, and that any effort to disregard the terms of such contracts would submit the corporation to liability for damages. That the quantum of such damages might be difficult of ascertainment is no reason why the court should interfere with an effort to honestly fulfill the same.

It is also objected that the terms of sale require the payment of the purchase price in cash at the time of the sale. It seems to me that this is a wise and ordinary precaution against adventurers attempting to gamble with the situation. If large quantities of machinery and other property are to be sold for a price of $240,000 or more it seems to me that any representative bidder would have no difficulty in financing himself in advance of the sale. The bid of anyone unable to do so should be scrutinized with great caution and even suspicion.

In the absence of any proof of fraud or incompetence against the directors there is a very powerful reason for re-

fusing in this case, to remove them by the appointment of a receiver, and that is that by no probability does it appear that to do so would accomplish the protection of the creditors and stockholders who are complainants. The proofs are that to enable any other stockholder or creditor than the General Electric Company to profit upon the winding up of this corporation it would be necessary that its assets sell for almost $3,000,000 over and above the offer, and only offer, that has been made. That the patent rights could bring the price obtained upon the sale up to that sum is incredible. As I have pointed out before, the value placed upon the patents by the company is justified and corroborated by the affidavits of experts, while the allegation of value by the complainants is without the slightest rational foundation.

For the reasons I have indicated, it does not seem to me that this is a proper case to remove the directors in favor of a receiver or receivers and the necessarily heavy expense thereof (*City Pottery Co.* v. *Yates*, *37 N. J. Eq. 543*), unless it be upon the ground now to be considered. The complainants maintain that under section 64 of the General Corporation act it is illegal under any circumstances for the directors to sell the corporate assets. That section provides as follows:

"Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign or transfer any of its estates, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they or either of them make any such sale, conveyance, assignment or transfer in' contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors; *provided*, that a *bona fide* purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached."

The cases of *Hoover Steel Ball Co.* v. *Shaefer Ball Bearing Co.*, *89 N. J. Eq. 435; Cope* v. *Wallon & Co.*, *77 N. J. Eq. 512*, and *Miller* v. *Gourley*, *65 N. J. Eq. 237*, are cited

by the complainants in support of their construction of that section. These, however, are all cases involving a preference given by a board of directors acting in the performance of their ordinary duties. Now, it must be apparent that directors who are faced with a critical condition such as is contemplated by section 31 of the General Corporation act, act in an entirely different capacity from the same officers in the ordinary performance of their duties as the governing body of a corporation. It must be borne in mind that the sixty-fourth section was a re-enactment of section 2 of the act entitled "An act to prevent frauds by incorporated companies." *P. L. 1829 p. 58.*

A reading of the cases just cited with this fact in mind makes the situation very different where, as provided in section 31, the consent of not less than two-thirds of all the stockholders authorize such sale. The prohibition against the sale, conveyance, &c., contained in the sixty-fourth section, refers to a sale of property by the directors of an insolvent corporation in the apparently ordinary course of their duties, but as the purpose of that section was to prevent frauds upon creditors, it is not violated when the sale is made in the manner provided by law for the winding up of the affairs of a corporation, the payment of its debts and the distribution of its assets among its stockholders according to their priorities.

It must be apparent that section 64 will not bear the construction for which the complainants contend when considered in connection with sections 65 and 66. There, the act authorizes the court to appoint a receiver or receivers of an insolvent corporation within the court's discretion. Were it true that under the sixty-fourth section the directors, as trustees, are incapacitated to wind up the affairs of such a company and distribute its assets according to law, then either there would be no discretion as to the appointment of a receiver or else if there were a discretion which the court refused to exercise it would be impossible to ever effectuate the intention of the law.

I will advise an order discharging the order to show cause and the receiver appointed on April 5th, 1923.